IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**DOCKETED**
NOV 0 6 2002

MARILYN CLARK, Derivatively on behalf of
SEARS ROEBUCK AND CO.,

      Plaintiff,

vs.

ALAN J. LACY, BRENDA C. BARNES,
MICHAEL A. MILES, DOROTHY A TERRELL,
RAUL H. YZAGUIRRE, WARREN L. BATTS,
DONALD J. CARTY, HUGH B. PRICE, HALL
ADAMS, JR., JAMES R. CANTALUPO, W.
JAMES FARRELL, GLENN RICHTER, PAUL J.
LISKA, THOMAS E. BERGMANN, AND KEVIN
KELEGHAN,

      Defendants,

  and

SEARS ROEBUCK AND CO., a New York
corporation,

      Nominal Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

02C 7984

JUDGE NORDBERG

Case No.

MAGISTRATE JUDGE LEVIN

**VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
ABUSE OF CONTROL, GROSS MISMANAGEMENT AND
WASTE OF CORPORATE ASSETS**

**JURY TRIAL DEMANDED**

1

## SUMMARY OF ACTION

1. This is a shareholder derivative action brought pursuant to Fed. R. Civ. P. 23.1 by plaintiff on behalf of Nominal Defendant Sears Roebuck and Co. ("Sears" or the "Company"), against Sears' Board of Directors and several of its top present and former officers, for intentional and/or negligent breach of fiduciary duty and other unlawful acts, during the relevant period between January 2002 and October 2002, inclusive, in connection with defendants' mismanagement of the Company and their ratification and/or complicity in the illegal conduct complained of herein.

2. Throughout the relevant period, defendants issued or acquiesced in the issuance of a series of press releases and Securities and Exchange Commission ("SEC") filings which materially misrepresented the financial and operational condition of the Company. Contained within said releases and SEC filings, throughout the relevant period defendants consistently represented that:

(a) Sears was growing its earnings and was meeting the targets publicly disseminated and repeatedly endorsed by defendants;

(b) This strong performance was due in significant part to the result of the solid performance of the Company's Credit and Financial Products division;

(c) The Defendants' foray into the new MasterCard business was allowing the Company's Credit and Financial Products division to foreseeably achieve year-over-year earnings growth of 22% in 2002; and

(d) The Company's provisions for uncollectible accounts was in line with guidance sponsored or endorsed by defendants and also stated in the Company's 2001 Annual Report filed with the SEC during the relevant period that such reserves were in fact adequate to meet the foreseeable credit card default rates associated with defendants' shift in credit card services, to the MasterCard business.

3. These, and other statements made by defendants during the relevant period and detailed in this Complaint, were each false and misleading because defendants concealed and purposefully, recklessly and/or negligently failed to disclose that the Company's risk related to uncollectible credit card accounts had increased materially throughout this time. In addition, such

statements were false and misleading because they masked the fact and did not disclose that defendants had materially under-reserved for uncollectible MasterCard credit accounts. Defendants' failure to take the proper reserves during the relevant period also had the effect of artificially inflating the Company's earnings and balance sheet throughout the relevant period.

4.     Investors only began to learn the true financial condition of the Company in early October 2002, after defendants caused Sears to issue a press release which revealed that the Company's earnings were growing at a rate far below the guidance repeatedly sponsored and/or endorsed by defendants. In fact, by the time defendants had admitted that earnings were not going to meet expectations endorsed only 10 days previously, they had been reduced by over 700 basis points. The true and shocking fact now revealed was that defendants would force the Company to take a $222 million charge to increase reserves for uncollectible accounts. In addition, according to the press release, earnings for the third quarter were 26% less than the previous year.

5.     In reaction to this belated disclosure, the price of Sears common stock plummeted, falling 32%, from an October 16, 2002 close of $33.95 per share to close at $23.15 per share on October 17, 2002 on extremely heavy trading volume.

6.     As a result of defendants illegal and improper conduct, and as a result of their participation in, and or willingness to ratify the illegal conduct alleged herein, defendants have caused significant and material damage to Sears. In addition to causing a crisis of confidence which had a direct and immediate impact on the Company's earnings and revenues, Sears has now been named in a series of class action law suits, now consolidated into a major class action, brought under the Securities Exchange Act of 1934. Those actions, which allege fraud in connection with the purchase and sale of securities, will cost the Company millions of dollars to defend and tens or hundreds of millions of dollars more to settle or satisfy.

7.     In addition, while Sears's stock traded to approximately $60.00 per share during the relevant period, on October 18, 2002, following defendants' belated disclosure that as a result of defendants' failure to take proper and timely adjustments to doubtful credit accounts, shares of the

Company stock traded to an eleven year trading low of $22.70 per share - - a decline of almost 60% from the relevant period high. Absent judicial intervention, defendants will not take the action requested herein, and in the continued breach of their fiduciary duties they will proceed to allow the wrongdoers who have profited substantially as a result of their misdeeds to escape justice.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

9.     Plaintiff brings this action on behalf of Sears pursuant to Rule 23.1 of the Federal Rules of Civil Procedure based on principles of state law which prohibit breach of the fiduciary duties owed by corporate fiduciaries. This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

10.     Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

11.     Plaintiff Marilyn Clark is, and at times relevant hereto was, a shareholder of Sears. Plaintiff Clark is a citizen of California.

12.     Nominal party Sears is a New York corporation with its principal place of business located at 3333 Beverly Road, Hoffman Estates, IL 60179. According to the Company, Sears is a mass market retailer, organized into four principal business segments: (i) Retail and Related Services; (ii) Credit and Financial Products; (iii) Corporate and Other; and (iv) Sears Canada. The Company's Retail and Related Services consist of 867 full-line stores located primarily in malls

4

nationwide. The Company's Credit and Financial Products segment manages Sears' domestic portfolio of credit card receivables - - which now includes approximately 18 million of the Company's MasterCard customers.

13.     Defendant Alan J. Lacy ("Lacy") is, and since December 2000 has been Chairman of the Board of the Company and served as President and Chief Executive Officer since October 2000. Defendant Lacy was also President of Services from 1999 to October 2000, President of Sears Credit from 1997 to 1999 (additionally Chief Financial Officer from 1998 to 1999) and Executive Vice President and Chief Financial Officer from 1995 to 1997. Defendant Lacy is a citizen of Illinois.

14.     Defendant Brenda C. Barnes ("Barnes") is a director of the Company having served in this capacity throughout the relevant period, since 1997. Defendant Barnes is a citizen of Illinois.

15.     Defendant Michael A. Miles ("Miles") is a director of the Company having served in this capacity throughout the relevant period, since 1992. Defendant Miles is a citizen of Illinois.

16.     Defendant Dorothy A. Terrell ("Terrell") is a director of the Company having served in this capacity throughout the relevant period, since 1995. Defendant Terrell is a citizen of Massachusetts.

17.     Defendant Raul H. Yzaguirre ("Yzaguirre") is a director of the Company having served in this capacity throughout the relevant period, since 2001. Defendant Yzaguirre is a citizen of Maryland.

18.     Defendant Warren L. Batts ("Batts") is a director of the Company having served in this capacity throughout the relevant period, since 1986. Defendant Batts is a citizen of Illinois.

19.     Defendant Donald J. Carty ("Carty") is a director of the Company having served in this capacity throughout the relevant period, since 2001. Defendant Carty is a citizen of Texas.

20.     Defendant Hugh B. Price ("Price") is a director of the Company having served in this capacity throughout the relevant period, since 1997. Defendant Price is a citizen of New York.

21.     Defendant Hall Adams, Jr. ("Adams") is a director of the Company having served

in this capacity throughout the relevant period, since 1993. Defendant Adams is a citizen of Illinois.

22.     Defendant James R. Cantalupo ("Cantalupo") is a director of the Company having served in this capacity throughout the relevant period, since 2000. Defendant Cantalupo is a citizen of Illinois.

23.     Defendant W. James Farrell ("Farrell") is a director of the Company having served in this capacity throughout the relevant period, since 1999. Defendant Farrell is a citizen of Illinois.

24.     Defendant Glenn Richter ("Richter") is currently the Chief Financial Officer of the Company having assumed this position on or about October 4, 2002 and prior to accepting this position served as Senior Vice President Finance since the inception of the relevant period. Defendant Richter is a citizen of Illinois.

25.     Defendant Paul J. Liska ("Liska") served throughout the relevant period as Chief Financial Officer of the Company, until he was removed from this position on or about October 4, 2002. Defendant Liska is a citizen of Minnesota.

26.     Defendant Thomas E. Bergmann ("Bergmann") is, and throughout the relevant period was, Chief Accounting Officer of the Company. Defendant Bergmann is a citizen of Illinois.

27.     Defendant Kevin Keleghan ("Keleghan") throughout the relevant period was the President of the Company's credit and financial products division, until his sudden resignation on October 4, 2002. Defendant Keleghan is a citizen of Illinois.

28.     The defendants identified herein in ¶¶13 - 23, *supra*, are the current officer and non-officer directors of the Company, and are referred to collectively herein as the "Director Defendants." In addition, the defendants identified herein in ¶¶24 - 27 *supra*, in combination with the Director Defendants, are referred to collectively as the "Individual Defendants." By reason of their positions and their ability to control the business and corporate affairs of Sears, the Director and Individual Defendants owed Sears fiduciary obligations of fidelity, trust, loyalty, good faith, fair dealing and due care, and were required to use their utmost ability to control and manage Sears in a fair, just and equitable manner and to act in furtherance of the best interests of Sears and all its shareholders. This

6

obligation includes a duty to conduct the Company's business in a fair and honest manner, and not to abuse the Company or its customers in such a manner that would have a direct and material adverse negative effect on Sears, its financial condition, operations or goodwill.

29.     In addition to the general fiduciary obligations defendants owed to Sears and its shareholders, defendants were also subject to more specific obligations as members of the several committees of the Board of the Company. According to Sears' latest Proxy statement, those committees included the following:

### Board and Committee Information

The Board of Directors and four committees of the Board govern Sears. During 2001, the Board met seven times. Directors discharge their responsibilities throughout the year at Board and committee meetings and also through considerable telephone contact and other communications with the Chairman and other key executives, as well as with external advisors such as legal counsel, outside auditors and investment bankers.

\* \* \*

The following table identifies the current membership of Board committees.... A summary of each committee's functions follows the table.

| Director | Audit | Compensation | Executive | Nominating |
|---|---|---|---|---|
| Hall Adams, Jr. | – | | | – |
| Brenda C. Barnes | | * | | – |
| Warren L. Batts | –* | | – | – |
| James R. Cantalupo | – | | | |
| Donald J. Carty | | – | | |
| W. James Farrell | – | – | | |
| Alan J. Lacy | | | * | |
| Michael A. Miles | | – | | –* |
| Hugh B. Price | – | | | – |
| Dorothy A. Terrell | | – | | |
| Raul H. Yzaguirre | – | | | |

( \* ) Committee Chair

30.     According to the Company's latest Proxy statement, the additional duties and responsibilities of the board members who served on the Audit Committee, include assuring the veracity of the Company's financial statements and to assure the following:

Assists the Board in monitoring:

The integrity of the financial statements of the Company.

The Company's system of internal control.

The independence and performance of the Company's independent public accountants.

The compliance by the Company with legal and regulatory requirements.

31. According to the Company's latest Proxy statement, the additional duties and responsibilities of the board members who served on the Executive Committee, include all of the duties of the full board, between Board meetings, as is necessary.

32. According to the Company's latest Proxy statement, the additional duties and responsibilities of the Board members who served on the Compensation Committee, include: (i) approving the compensation of the Chief Executive Officer and other officers of the Company; and (ii) except as provided in specific plans or as resolved by the Board, is responsible for administration of all benefit plans, including stock option plans, that affect officers' compensation.

33. According to the Company's latest Proxy statement, the additional duties and responsibilities of the Board members who served on the Nominating Committee, include:
Evaluat[ing] the performance of the Board of Directors and the Chairman and Chief Executive Officer.

Review[ing] the management organization of the Company and succession plans for the Chairman and Chief Executive Officer.

Mak[ing] recommendations to the Board concerning the composition of the Board, the compensation of the Board, the election of executive officers, the appointment of the Chairman for each committee of the Board, and the procedures for shareholder voting.

Review[ing] the Company's corporate governance guidelines.

## ADDITIONAL DUTIES OF SEARS' DIRECTORS AND OFFICERS

34. Defendants owed fiduciary duties of good faith and fair dealing to Sears and its public shareholders. To discharge their duties, defendants were required to independently and effectively supervise and regulate Sears' executives and policies, practices, controls and financial affairs and to:

(a) act in the best interests of Sears and prevent any abuse of control by other top executives in the conduct of the business and affairs of Sears;

8

(b)     govern Sears to utilize its resources in a manner to benefit the Company and its public shareholders and not the personal interests or preferences of defendants;

(c)     refrain from abusing their positions of control;

(d)     not favor their own interests at the expense of Sears or its public shareholders;

(e)     in good faith oversee, supervise and direct the business and affairs of Sears and its executives in accordance with the applicable laws;

(f)     upon receiving notice of improper conduct to take steps to correct or remedy that conduct;

(g)     exercise reasonable control and supervision over the officers and employees of Sears; and

(h)     to honestly communicate with Sears's shareholders.

Thus, each of the Individual Defendants owed Sears and its public shareholders obligations of candor, fidelity and loyalty, and not to attempt to frustrate or impede the maximization of shareholder value in order to obtain any improper monetary benefit in their capacity as an officer and/or director of the Company.

35.     Purportedly in exchange for their loyalty and fidelity, according to the Company's FY:02 Proxy Statement, defendants Lacy, Keleghan and Liska, then the senior-most officers and/or employee-directors of the Company received very significant compensation packages from Sears during FY:99, 00 and 01, as follows:

**Summary Compensation Table**

| Name Options | Yr. | Salary($) | Bonus($) | Other Yrly. Comp. | Restricted Share Awrd. | Securities Under-lying |
|---|---|---|---|---|---|---|
| **Alan J. Lacy** | 200 1 | 900,00 0 | 672,975 | 138,3 06 | — | 369900 |
| | 200 0 | 675,00 0 | 1041247 | 7,950 | — | 603,750 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 1999 | 566,712 | 827256 | 3,940 | 1,125,000 | 40,000 |
| **Kevin T.Keleghan** | 2001 | 478,598 | 311,945 | 6,840 | — | 87,300 |
| | 2000 | 387,500 | 486419 | — | — | 23,378 |
| | 1999 | 313,317 | 348,720 | 18,478 | 450,000 | 10,600 |
| **Paul J. Liska** | 2001 | 408,333 | 695,000 | 2850 | 2,026,000 | 175000 |

36.     Also, purportedly in exchange for their loyalty and fidelity, Sears's non-employee directors also receive and/or received lucrative compensation from the Company to assure their obligations of good faith and candor to Sears and its outside shareholders. According to the Company's FY:02 Proxy Statement, these non-employee directors received very significant compensation packages from Sears, as follows:

### Directors' Compensation and Benefits

In order to align directors' interests with shareholders' interests, compensation is paid to directors who are not employees of the Company in the form of deferred shares, stock options and cash.

*       Each year, the Company grants to each non-employee director deferred shares valued at approximately $30,000. The deferred shares vest over the twelve-month period following the grant date. The directors receive their vested deferred shares as shares of Sears common stock when they leave the Board.

*       The Company annually grants each non-employee director an option to purchase Sears common shares. The option is valued at approximately $30,000 and vests at the next annual meeting. The option exercise price equals the average market price of the underlying shares on the grant date.

    \*      The Company pays each non-employee director an annual cash retainer in quarterly installments. ***Effective April 1, 2002, the amount of the annual cash retainer will be increased from $30,000 to $40,000....*** Further, the Company pays the chairs of the Audit, Compensation and Nominating Committees additional annual cash retainers, which will ***increase from $5,000 to $7,500*** as of April 1, 2002....

\*   \*   \*

        Non-employee directors who were first elected to the Board prior to December 31, 1995 will receive $30,000 annually after they retire from the Board pursuant to the Non-Employee Director Retirement Plan. The Non-Employee Director Retirement Plan was terminated in 1995.

37.    Each officer and director of Sears owed Sears and its public shareholders the duty to exercise a high degree of due care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Sears' directors complained of herein involves a knowing and culpable violation of their obligations as directors of Sears, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the directors were aware or should have been aware posed a risk of serious injury to the Company. The conduct of Sears' officers and directors who permitted, engaged in or failed to rectify defendants refusal to properly reserve for doubtful accounts and to properly oversee and manage the Company, have failed to take any action against them.

38.    Each defendant is sued individually in his respective capacity as an officer and/or director of Sears. The liability of each arises from the fact that each participated in the plan to advance his own personal interests at the expense of Sears and its shareholders.

39.    Plaintiff alleges herein that the Individual Defendants, separately and together, in violation of Generally Accepted Accounting Principles ("GAAP"), allowed and or acquiesced in defendants' failure to properly reserve for doubtful credit accounts and, thereby, violated the fiduciary duties owed to Sears and its public shareholders, including their duties of loyalty, good faith and independence, insofar as they have allowed this misreporting and have allowed the

defendants to misrepresent the financial condition of the Company, both of which ultimately cost the Company billions of dollars in the reduction of Sears' market capitalization and equity value - - including a single-day market value reduction of over $3 billion following publication of defendants corrective disclosure.

40.    Because the Individual Defendants have breached their duties of loyalty, candor and independence in connection with their failure to act in good faith and abide by their obligation to conduct the business and operations of the Company in a fair and truthful manner and not to abuse their confidence and trust by failing to properly account for the Company's credit card losses, the Individual Defendants, as a matter of law, have breached their fiduciary duties of good faith and fair dealing owed to Sears and its shareholders.

## SUBSTANTIVE ALLEGATIONS

### Background to the Relevant Period

41.    Beginning in 2000, defendants embarked on a strategy which, they purported, would have a foreseeable positive impact on Sears' earnings and revenues. In furtherance of this strategy, at that time, defendants caused the Company to substitute approximately 7 million Sears Gold MasterCard accounts for its traditional Sears Card accounts. In making this exchange, defendants caused the Company to widely expand its credit risk by issuing credit cards to customers that could be used in virtually any retail establishment in the country, as well as qualify the holder for cash advances and other benefits. Prior hereto, Sears had a large credit card business in its Sears Card accounts, however, these accounts could *only* be used in Sears stores.

42.    While the issuance of universally accepted credit cards expanded the Company's credit risks substantially, in 2001 defendants plowed ahead in their race to enter the highly competitive MasterCard market and caused the Company to substitute an additional 11 million Sears Gold MasterCard accounts for Sears Card accounts. Importantly, the Company's risks were substantially compounded due to the fact that, as a result of the limitations imposed on the

12

Company's classic accounts, the vast majority of Sears' accounts prior to the switch to MasterCard carried little or no balances, evidenced by the generation of little or no financing fees.

43.     The shift in risk of defendants' expanded credit card program is also evidenced by the fact, as the Company's Fiscal Year 2000 financial results revealed, during the prior year when the Company was managing Sears accounts only and not MasterCard accounts, Sears net domestic provision for uncollectible accounts was roughly flat with 1999 - - evidencing little if any additional credit risk related to the Company's customer accounts.  In fact, the net charge-off rate for 2000 actually decreased to 5.12% from 6.44% in 1999.  The domestic allowance for uncollectible accounts at year-end 2000 was $649 million, or 4.03% of receivables versus 4.26% at the prior year-end.  Also in 2000, this allowance was reduced by $111 million due to the transfer of $2.4 billion of receivables to the securitization Master Trust.

44.     In addition to converting all of Sears' accounts to MasterCard accounts, defendants also caused the Company to begin offering the Sears Gold MasterCard to approximately 180,000 new accounts - - again, further exposing the Company to unknown and substantial credit risks. While investors knew of defendants' plan and also knew to expect *some* additional risk, as a result of defendants entry into this new MasterCard business, defendants assured investors that the Company maintained adequate reserves and a proper system of internal financial controls to at least guarantee that Sears' financial statements were reliable and would be prepared in accordance with standard accounting principles.

45.     Defendants' reinforced these notions prior to and throughout the relevant period, as evidenced by the statements contained in defendants FY:01 Form 10-K, filed with the SEC during the relevant period on March 14, 2002, which stated the following:

**Management's Report**

     The financial statements, financial analyses and all other information were prepared by management, which is responsible for their integrity and objectivity. *Management believes the financial statements, which require the use of certain estimates and judgments, fairly and accurately reflect the financial position and*

*operating results of Sears, Roebuck and Co. ("the Company") in accordance with accounting principles generally accepted in the United States of America.* All financial information is consistent with the financial statements.

*Management maintains a system of internal controls that it believes provides reasonable assurance that, in all material respects, assets are maintained and accounted for in accordance with management's authorizations and transactions are recorded accurately in the books and records.* The concept of reasonable assurance is based on the premise that the cost of internal controls should not exceed the benefits derived. To assure the effectiveness of the internal control system, the organizational structure provides for defined lines of responsibility and delegation of authority. The Company's formally stated and communicated policies ·demand of employees high ethical standards in their conduct of its business. These policies address, among other things, potential conflicts of interest; compliance with all domestic and foreign laws, including those related to financial disclosure; and the confidentiality of proprietary information. *As a further enhancement of the above, the Company's comprehensive internal audit program is designed for continual evaluation of the adequacy and effectiveness of its internal controls and measures adherence to established policies and procedures.*

46.     Further obscuring the Company's credit clarity, was the fact that, throughout the relevant period, Sears offered "zero-pay" financing deals to its preferred customers, which allowed consumers to pay nothing for 12 months on bigger ticket items. Since this program adds an additional 360 days to the delinquency period, it is impossible for an account under this offer to go delinquent without any payment obligation to begin with. This and other similar programs designed by defendants to boost sales, further increased investor reliance on the transparency of defendants' financial reporting and the credit loss reserves reported by defendants.

**False & Misleading Statements Made By Defendants During the Relevant Period**

47.     The relevant period commenced on January 17, 2002, at which time defendants caused Sears to issue a release titled "Sears Expects 2002 EPS to Increase 13 to 15 Percent; Fourth Quarter 2001 Earnings Increase 11 Percent" which announced results for the fourth quarter and year end December 31, 2001, and which also provided guidance which defendants purported was reasonably foreseeable based on then existent market conditions, as follows:

Sears, Roebuck and Co. Chairman and Chief Executive Officer Alan J. Lacy today said the *company expects to see earnings per share increase 13 to 15 percent in 2002.*

>*"Our preliminary outlook for 2002 is for comparable earnings per share to increase in the range of 13 to 15 percent," said Lacy.* "We anticipate that our retail and related services business will grow operating income at a low double-digit rate, and *credit and financial products will grow at a mid single-digit rate*. Sears Canada should post improved profitability on a consolidated basis and our corporate and other segment should reflect the significant benefits of our productivity initiatives."
>
>Lacy added that the company ended the year with its domestic retail businesses well positioned for 2002, with inventories down over $500 million from the end of last year.
>
>* * *
>
>"Despite slow holiday sales, our retail and related services profits increased solidly, driven by margin rate improvements across virtually all of our retail formats," said Lacy.

In addition to the foregoing, this release also specifically commented on the performance of the Company's Credit and Financial Products divisions, stating the following:

>**Credit and Financial Products**
>
>Operating income excluding non-comparable items increased by $86 million or 25.3 percent to $426 million as favorable funding costs and higher revenues offset higher provision expense.
>
>Fourth quarter domestic credit and financial products revenues increased 1.8 percent from a year ago, to $1.33 billion due to higher average receivable balances. Credit receivables at the end of the fourth quarter grew 2.2 percent over the prior year to $27.6 billion.
>
>Funding costs declined by $119 million or 29.5 percent from last year's quarter due to a favorable interest rate environment.
>
>The provision for uncollectible accounts increased by $52 million or 15.3 percent over last year's period. The net charge-off rate for the quarter increased to 5.23 percent from 4.79 percent last year primarily due to increased customer bankruptcy filings over last year. *Portfolio quality remains stable with flat year-over-year delinquencies*. The domestic allowance for uncollectible accounts of $1.1 billion is flat as a percentage of ending credit receivables.

48.     Defendants' January 17, 2002 release also reported fourth quarter 2001 net income, excluding non-comparable items, of $657 million, or $2.02 per share, an 11% per share increase over

the prior year fourth quarter. Including the non-comparable items, reported fourth quarter 2001 net income was $494 million or $1.52 per share, compared with $442 million, or $1.32 per share in the fourth quarter of 2000. For the full year 2001 defendants also reported net income, excluding the effect of non-comparable items, of $1.39 billion, or $4.22 per share, compared with $1.46 billion, or $4.21 per share for 2000. According to defendants, reported full-year 2001 net income was $735 million, or $2.24 per share, versus $1.34 billion or $3.88 per share in 2000.

49. On or about March 14, 2002, defendants caused the Company to file with the SEC its year end financial report pursuant to Form 10-K, for the period ended December 31, 2001, which stated, in part, the following:

**CREDIT AND FINANCIAL PRODUCTS:**

This segment manages the Company's domestic portfolio of credit card receivables. The domestic credit card receivables portfolio consists primarily of Sears Card and Sears ChargePlus (collectively "Sears Card") and Sears Gold MasterCard and The Great Indoors Gold MasterCard (collectively "Sears Gold MasterCard") account balances. The proprietary Sears Card receivables are generated primarily from purchases of merchandise and services from the Company's domestic operations. The Sears Gold MasterCard products are widely accepted by merchants outside the Company. The Sears Gold MasterCard product receivables are generated from purchases from the Company and other merchants, balance transfers and cash advances. This segment also sells related financial products such as credit protection and insurance products.

\* \* \*

During the second quarter of 2001, the Company recorded a non-cash, pretax charge of $522 million ($331 million after-tax) to establish an allowance for uncollectible accounts related to $12 billion of securitized credit card receivables reinstated on the Company's balance sheet as a result of the Company's adoption of Statement of Financial Accounting Standards ("SFAS") No. 140 in April 2001 (see Note 3 of the Notes to Consolidated Financial Statements). In addition, effective in the second quarter of 2001, the Company's securitization transactions are accounted for as secured borrowings and the Company ceased recording securitization income. As such, securitization income reported in prior periods is noncomparable subsequent to March 2001.

\* \* \*

**CRITICAL ACCOUNTING POLICIES**

Management's Discussion and Analysis discusses the results of operations and financial condition as reflected in the Company's consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. As discussed in Note 1 to the Company's

16

Consolidated Financial Statements, the preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and reported amounts of revenues and expenses during the reporting period. *On an ongoing basis, management evaluates its estimates and judgments, including those related to inventory valuation; the allowance for uncollectible accounts; depreciation, amortization and recoverability of long-lived assets, including intangible assets; restructuring and other reserves; the calculation of retirement benefits and revenue recognition*. Management bases its estimates and judgments on its substantial historical experience and other relevant factors, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources.

\* \* \*

In 2001, the net domestic provision for uncollectible accounts increased $452 million from 2000 primarily due to the additional credit card receivable balances recorded when the Company consolidated its securitization structure for financial reporting purposes in the second quarter of 2001. As a result, charge-offs that had previously been recognized by the master trust are now included in the provision for uncollectible accounts. Charge-offs increased by $446 million reflecting the inclusion in 2001 of charge-offs for the previously sold and securitized receivables and an increase in the net charge-off rate in 2001 to 5.32% from 5.12% in 2000, primarily due to increased customer bankruptcy filings. Despite the increase in bankruptcy filings in 2001, the delinquency rate for 2001 remained relatively flat with 2000. At December 29, 2001, the year-end allowance as a percent of on-book receivables was 4.04%, or $1.1 billion versus 4.03% or $649 million at year-end 2000.

50.     On or about April 10, 2002, defendants caused the Company to issue a release titled

"Sears Expects Record First Quarter Comparable EPS Of $0.93; Expects Full Year Earnings To Rise

Approximately 17 Percent," which guidance defendants purported was reasonably foreseeable based

on then existent market conditions, as follows:

Sears, Roebuck and Co. today announced preliminary first quarter earnings. The company anticipates that earnings per share, excluding non-comparable items, will be $0.93 for the first fiscal quarter of 2002 versus $0.45 in the first quarter of last year, an increase of 107 percent.[1] These strong results were driven by the Retail and Related Services segment, which improved operating earnings by over $140 million from last year.

---

[1]Reported earnings per share, including non-comparable items, are anticipated to be $0.34 per share for the first quarter of 2002 as compared with $0.53 last year. Reported earnings for the first quarter of 2001 included net securitization income of $26 million, or $0.08 per share.

17

"I am particularly pleased with our improved retail earnings," said Chairman and Chief Executive Officer Alan J. Lacy. "These results demonstrate the initial success of the strategic initiatives we have begun to implement. While revenues continue to be soft, our focus on gross margin, inventory levels and operating expenses is driving substantial profit improvement."

The Credit and Financial Products segment also had a very strong quarter with an expected earnings increase of approximately 20 percent. The company also repurchased 8.2 million shares totaling $427 million during the quarter.

In addition to the foregoing, defendants stated that the Company was on track to meet or exceed 2002 earnings and revenue expectations, and used this release to again issue the following guidance:

**Updated 2002 Outlook**
"We clearly had a strong first quarter from a profit perspective," said Lacy. "As a result, we now expect 2002 full year comparable earnings per share to increase approximately 17 percent from the prior year amount of $4.22. However, it is still early in the year and we continue to be cautious due to the uncertain economic outlook for the year and the execution risk inherent during the implementation of our Full-line store strategy."

Previous expectation was for full year comparable earnings per share to increase in the range of 13 to 15 percent.

510      On or about July 18, 2002, defendants caused the Company to issue a release titled "Sears Reports Record Second Quarter 2002 Earnings," which guidance defendants purported was reasonably foreseeable based on then existent market conditions, as follows:

Sears, Roebuck and Co. today reported record second quarter 2002 net income of $420 million, or $1.31 per share, a 36 percent per share increase over the prior year comparable second quarter of $0.96 per share. The *increase is due to the continuing performance improvements in the company's retail and credit businesses.*

*"Profits for the quarter showed solid increases across all segments,"* said Chairman and Chief Executive Officer Alan J. Lacy. "Margin rate improvements continue to benefit the retail businesses, while *Credit and Financial Products results were driven by the growth of the Sears Gold MasterCard product and a favorable interest rate environment."*

In addition to the foregoing, defendants stated that Sears was on track to meet or exceed defendants' 2002 earnings and revenue expectations, and then guided expectations even higher, as follows:

"First half earnings exceeded our expectations," said Lacy. "As a result, *we now expect 2002 full year comparable earnings per share to be approximately $5.15, a 22 percent increase over the prior year amount of $4.22."* This outlook takes into account the negative impact on sales from the re- positioning and restructuring initiatives. Previous expectation was for full year comparable earnings per share to increase approximately 17 percent.

18

Defendants stated that the Company was on track to meet or exceed 2002 earnings and revenue expectations, and used this release to again issue the following guidance:

### Credit and Financial Products

Credit and Financial Products' operating income, excluding non-comparable items, increased by $67 million or 19.4 percent to $412 million as favorable funding costs and higher revenues offset higher provision and selling and administrative expenses.

Second quarter domestic Credit and Financial Products revenues increased 3.5 percent from a year ago to $1.3 billion, due primarily to higher average receivable balances. Credit receivables at the end of the second quarter grew 8.8 percent over the prior year to $28.2 billion.

Funding costs declined by $118 million or 32.3 percent from last year's quarter due to a favorable interest rate environment.

The domestic provision for uncollectible accounts, on a comparable basis, increased by $43 million or 12.3 percent over last year's period, partially due to receivables growth. The net charge-off rate for the quarter decreased to 5.32 percent from 5.42 percent last year primarily due to decreased customer bankruptcy filings.

Year-over-year delinquencies decreased 39 basis points from 7.26 percent to 6.87 percent, indicating stable portfolio quality. The domestic allowance for uncollectible accounts of $1.4 billion is 5.10 percent of ending credit receivables compared with 5.24 percent at the end of last quarter.

52. The statements contained in the above-referenced releases were false and misleading for the following reasons, among others:

(a) Defendants concealed and purposefully, recklessly and/or negligently failed to disclose that the Company's risk related to uncollectible accounts had increased materially throughout this time;

(b) Defendants purposefully, recklessly and/or negligently issued statements designed to or which did mask the fact that defendants had materially under-reserved for uncollectible accounts;

(c) Defendants' failure to take the proper reserves during the relevant period also had the effect of artificially inflating the Company's earnings and balance sheet in violation of

GAAP; and

(d)     Defendants' statements concerning the internal procedures and safeguards purportedly adopted to safeguard investors and assure the accuracy and completeness of the Company's financial reporting were misleading throughout the relevant period

## THE TRUE FINANCIAL CONDITION OF THE COMPANY & DEFENDANTS' FAILURE TO PROPERLY RESERVE FOR DELINQUENT CREDIT ACCOUNTS IS BELATEDLY DISCLOSED

53.     On October 2, 2002, defendants caused the Company to issue a release which stated that, during the second quarter of 2002 Sears "refined its method of determining its allowance for uncollectible accounts, resulting in a pre-tax charge of $300 million ($191 million, net of tax)," in addition to the following:

> The company initially recorded the charge as a cumulative effect of a change in accounting principle as of the beginning of 2002. In consideration of further interpretive guidance from the staff of the Securities and Exchange Commission, Sears has amended its filings to report the effect of the refinement in the allowance methodology as a change in estimate instead of a change in accounting principle.

> The effect of the above on the company's results is to increase reported first quarter 2002 net income by $191 million ($.59 per share) and to reduce second quarter 2002 reported net income by the same amount. The company has filed amended quarterly reports for the first and second quarter to reflect this change.

54.     Immediately after publishing this release, defendants told the media that this charge would have no effect on earnings. In fact, on October 2, 2002, *Reuters* news service reported that this charge would have "***no net effect on earnings per share for the first half of the fiscal year.***" In addition, defendants also stated at this time that this charge was a mere accounting issue and that the Company had made this change after receiving "guidance" from the SEC. These statements continued to obscure the true, impaired financial condition of the Company at this time.

55.     While defendants pretended that the huge write off was not the result of accounting improprieties or the inability of defendants to manage the risk of their new MasterCard business, on October 4, 2002, defendants suddenly announced the resignation of defendant Keleghan, President

20

of the Company's credit and financial products division. At this time, defendants stated that they had tapped Chief Financial Officer Paul Liska to head this division and then promoted Glenn Richter to fill the role of CFO. At this time, defendants gave no reason for defendant Keleghan's sudden departure.

56. Days later, however, on or about October 7, 2002, defendants caused Sears to issue a release which again confirmed guidance for the full year 2002 as well as again providing preliminary third quarter earnings estimated, again maintaining their full-year outlook of $5.15 comparable EPS, and stating the following:

> Sears, Roebuck and Co. announced today that third quarter 2002 earnings per share are expected to be in the range of $0.80 to $0.82, versus earnings per share of $0.80 in the same quarter last year. The quarter includes $0.03 of dilution for the Lands' End acquisition. The Company's third quarter earnings release will be issued on Oct. 17.
>
> In addition, Sears reaffirmed its 2002 full-year outlook for a 22 percent increase in comparable earnings per share to $5.15, although guidance was revised for its principle business segments. The company now expects comparable earnings increases in the low- to mid-thirty percent range in its retail and related services segment and in the mid-single digit percent range in its credit and financial products segment.

57. Following publication of the October 7, 2002 release, *Reuters* reported that, in explaining why defendant Keleghan had suddenly left the Company, defendant Lacy was quoted during a conference call hosted by defendants, as stating that Keleghan was forced out of Sears because Lacy had ***"lost confidence in his personal credibility***," as follows:

> Sears, Roebuck and Co. warned on Monday that third-quarter profits would fall below Wall Street expectations as its credit card business -- a key profit engine -- showed signs of losing steam in a slumping economy, driving its shares down more than 14 percent.
>
> The timing of the warning left ***some analysts wary***, coming just days after the No. 4 U.S. retailer said it fired the head of its credit and finance unit, Kevin Keleghan and announced an accounting change. Sears said the issues were unrelated.
>
> ***"Kevin left the company at my request because I lost confidence in his personal credibility," Sears Chief Executive Officer Alan Lacy*** said on a conference call on Monday, but would not answer further questions from analysts on the issue.
>
> "His departure is not related to business performance and does not indicate a change in our credit strategy," he said.

Bill Dreher, retail analyst with WR Hambrecht, said *those comments were disconcerting because they were out of character with the usually mild-mannered Lacy.*

"For those who know Lacy, he's a very mild-mannered, soft-spoken, consummate professional," Dreher said. "Frankly, those comments were slightly out of keeping. That was *a major red flag."*

The string of negative news "causes us greater concern that the transition of Sears may have hit a real bump in the road," Dreher said.
·Efforts to reach Keleghan for comment were unsuccessful.

*"It is a little odd for Lacy to state that he had asked him to leave because his personal credibility was damaged, but it has nothing to do with the business,"* said Roz Bryant, retail analyst at research firm Morningstar.

"It just leaves you to wonder, so what does it have to do with? Was he cheating on the golf course? There are a lot of questions and we're seeing that reflected in the sell-off."

The shares closed down $5.39, or 14.3 percent, at $32.25 on the New York Stock Exchange -- their weakest since the post-Sept. 11 lows.

58.    The full scope of defendants' accounting improprieties and the true financial condition of the Company began to be revealed on or about Oct. 17, 2002, after defendants caused Sears to issue a release which revealed that the Company would be forced to take a $222 million charge to increase reserves for uncollectible accounts, and that revenues were growing at a rate far below the guidance repeatedly sponsored and/or endorsed by defendants. By the time defendants admitted that revenues were not going to meet the expectations which they endorsed only 10 days previously, they were already down over 700 basis points. In addition, according to the release, earnings for the third quarter were 26% less than the previous year.

59.    On October 17, 2002, defendants shocked the market by issuing a release which stated that "Sears Reports Lower Than Expected Third Quarter EPS of $0.59" and which revealed that the Company would now be forced to increase reserves by over $220 million which "Provision Increase Leads to Revised 2002 Outlook," as follows:

Sears, Roebuck and Co. today reported third quarter 2002 net income of $189 million, or $0.59 per share, a *26 percent decrease* from the prior year third quarter earnings of $0.80 per share. These *results reflect a $222 million increase in the domestic provision for uncollectible accounts.*

## 2002 Outlook

*Sears has reduced its 2002 full-year outlook for comparable earnings* per share to $4.86 per share, *a 15 percent increase over the prior year amount of $4.22. The company had previously expected comparable earnings per share of $5.15 for 2002, or a 22 percent increase....*

"On October 7, in conjunction with discussing the change in management of our Credit and Financial Products business, we reaffirmed our previous earnings guidance for the year," said Chairman and Chief Executive Officer Alan J. Lacy. "Today's revision to that guidance reflects additional increases in the allowance for uncollectible accounts as a result of analysis over the past week....

\* \* \*

## Credit and Financial Products

Credit and Financial Products' operating income was $284 million, down 28 percent compared to the prior year, as favorable funding costs and higher revenues were offset by higher provision and selling and administrative expenses.

Third quarter domestic Credit and Financial Products revenues increased 4 percent from a year ago to $1.4 billion, due primarily to higher average receivable balance growth. Credit receivables at the end of the third quarter grew 11.5 percent over the prior year to $29.3 billion.

Funding costs declined by $89 million or 26.0 percent from last year's quarter due to a favorable interest rate environment.

The domestic provision for uncollectible accounts increased $222 million over the prior year period due to a *$189 million increase to the allowance for uncollectible accounts*. The allowance increase reflects receivables growth, recent increases in charge-off trends and a cautious economic outlook for the remainder of the year. The net charge-off rate for the quarter decreased to 5.55 percent from 5.62 percent last year, reflecting increased charge-offs offset by the effect of receivables growth.

60.     In reaction to this belated disclosure, the price of Sears common stock plummeted, falling 32%, from an October 16, 2002 close of $33.95 per share to close at $23.15 per share on October 17, 2002 on extremely heavy trading volume. The decline in the value of Sears common stock was caused as a direct result of the belated disclosure of defendants failure to take proper and timely adjustments to the Company's reserve for doubtful accounts, the effect of which was to artificially inflate earnings and profits. Sears stock, which had traded to approximately $60 per share during the relevant period, now trades below $23.00 per share.

61.     This massive decline in the price of Sears shares resulted in an immediate *$3.85*

23

***billion reduction in the value of Sears market capitalization.*** On October 17, 2002, *Reuters* reported the following:

> **Investors wipe $3.85 bln out of Sears Retailer's shocking miss on earnings due to credit woes**
>
> Sears Roebuck shares dived nearly 32 percent in heavy trading Thursday and touched on a fresh trough after the department-store giant ***didn't even come close to meeting drastically reduced third-quarter expectations.***
>
> After reporting a 28 percent earnings miss, Sears shares plunged a numbing $10.80 to ***finish an off-the-charts trading session at $23.15, crashing past an 11-year low of $26.65 reached only a week ago.*** Thursday's finish extended that stretch to a 20-year bottom.
>
> ***By the day's end, investors had wiped out a stunning $3.85 billion in market capitalization*** when more than 35.7 million shares changed hands -- nearly 12 times the average daily volume -- in the most vigorous day of trading in Sears' history as a public company.
>
> Only a week ago, Sears cautioned investors that credit-card delinquencies would take a bite out of third-quarter profits. As a result, earnings expectations were lowered to 82 cents a share, the average forecast of analysts polled by Thomson First Call.
>
> But investors were shocked when Sears said Thursday that its earnings were well below that, coming in at 59 cents a share, or $189 million. That's 26 percent below the year-ago period when Sears tallied profits of 80 cents a share, or $262 million.

62.    Following defendants shocking and belated disclosure, by October 18, 2002, Standard & Poor's credit rating agency as well as Fitch Ratings service issued releases stating that they were considering whether to cut or downgrade their ratings on Sears' debt.  S&P said it may cut its "A-minus" long-term credit and debt ratings for Sears and Sears Roebuck Acceptance Corp., its fourth-lowest investment grade.  Fitch stated that its action followed the recent revision of Sears' rating outlook to negative due to continuing concerns about the Company's weak sales trends.

63.    During the relevant period, defendants misled the investing public, thereby inflating the price of Sears's common stock, by publicly issuing and/or causing the Company to issue false and misleading statements and omitting to disclose facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were false and misleading in that they failed to disclose adverse information and misrepresented the truth about the

Company, its business and operations, as alleged herein.

## THE SEARS BOARD HAS BREACHED THE FIDUCIARY DUTIES IT OWED TO THE SHAREHOLDERS OF THE COMPANY

64.    The Company's directors violated all notions of good faith and fair dealing for the following reasons:

(a)    Defendants created the false and misleading impression that defendants had reported the financial condition of the Company in accordance with GAAP, and that all necessary and proper reserves were taken on a timely basis;

(b)    As a result of defendants' failure to make such necessary and proper adjustments to the Company's reserves for doubtful accounts, the Company's financial statements during the relevant period were artificially inflated and did not reflect the true financial condition of Sears;

(c)    As a result of defendants' failure to record all proper adjustments to the Company's reserves for doubtful accounts, defendants had no reasonable basis to repeatedly provide and increase guidance for full year 2002;

(d)    It was a breach of fiduciary duty for defendants to continuously fail to disclose that their artificial inflation of the Company's revenues and earnings was masking the fact that Sears was not performing according to expectations sponsored by defendants; and

(e)    It was a breach of fiduciary duty for the Sears Board to fail to prevent defendants from issuing false and misleading statements and financial reports about Sears, and it was a further breach of duty by the Board to fail to take any action against the officers and/or directors directly responsible for the illegal actions complained of herein.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

65.     Plaintiff brings this action derivatively, pursuant to state law, in the right and for the benefit of Sears to redress injuries suffered and to be suffered by Sears as a direct result of the violations of law and breaches of fiduciary duty and corporate waste by defendants. Sears is named as a nominal defendant in this derivative action solely in a derivative capacity. However, since nominal defendant Sears is a corporation organized under the laws of New York, and since New York does not require plaintiff to make a demand on the board of directors prior to initiating such action if said demand is or would be futile, as is the case here, no such demand on the Sears Board has been made and no such demand for action is required.

66.     Plaintiff is an owner of Sears common stock and was an owner of Sears common stock at times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

67.     Plaintiff will adequately and fairly represent the interests of Sears in enforcing and prosecuting its rights, and has obtained counsel experienced, competent and practiced in prosecuting derivative actions.

68.     In addition to their dominance and control over Sears as a result of their membership on the Board of Directors of the Company and/or stock ownership, defendants also have long-standing personal and professional entanglements and relationships with other Board members and/or realize significant benefits as a result of related-party business they conduct with Sears or one-another, and this has prevented them and is continuing to prevent them from acting independently to fulfill the fiduciary duties owed to Sears and its shareholders and from taking the action requested herein. Moreover, as a result of these conflicts of interest defendants can not and will not be able to independently consider any demand by plaintiff in a disinterested manner to take the action requested herein.

69.     In fact, several of the defendant Board members also sit on other boards and/or have other business dealings with one another which have prevented them and continues to prevent them from taking the action requested by plaintiff herein, as follows:

26

(a)    According to the Company's FY:02 Proxy statement, defendants Batts, Farrell and Miles each have extra-Company entanglements and are each members of the board of Allstate Insurance Company and served in this capacity at the same time as they served on the Board of the Company. Neither Batts, Farrell nor Miles will take any action against the other which would jeopardize their standing on the Board of Sears or Allstate or any other company on whose board they serve or seek to serve. To take the action requested by plaintiff herein would necessarily jeopardize their position at Sears and at Allstate, and therefore these directors are not unbiased and can not evaluate any demand by plaintiff in a fair an impartial manner;

(b)    According to the Company's FY:02 Proxy statement defendant Carty is Chairman of the Board, President and Chief Executive Officer of AMR Corporation and American Airlines, Inc. In addition, defendant Miles is also on the Board of AMR. In addition, both Miles and Carty also serve on the board of Dell Computer. Both Carty and Miles each have extra-Company entanglements and financial interests which transcend their participation on the Board of the Company and neither Carty nor Miles will take any action against the other which would jeopardize their standing on the Board of AMR, Dell or Sears, or any other company on whose board they serve or seek to serve. To take the action requested by plaintiff herein would necessarily jeopardize their positions at Sears, AMR and Dell, in addition to any other boards that would consider paying for their services, and therefore these directors are not unbiased and can not evaluate any demand by plaintiff in a fair an impartial manner;

(c)    According to the Company's FY:02 Proxy statement defendant Cantalupo is Vice Chairman and President, Emeritus of McDonald's Corporation (restaurant chain) since January 1, 2002, Vice Chairman and President from 1999 to 2002, Vice Chairman of McDonald's Corporation and Chairman and Chief Executive Officer, McDonald's International, from 1998 to 1999 and as President and Chief Executive Officer, McDonald's International, from 1991 to 1998 and he currently serves as a director of McDonald's Corporation. In addition, defendant Adams is also a director at McDonald's. Defendants Cantalupo and Adams therefore have extra-Company

27

entanglements and financial interests which have prevented them and continue to prevent them from taking any action against the other which would jeopardize their standing on the Board of McDonald's or Sears, or any other company on whose board they serve or seek to serve. To take the action requested by plaintiff herein would necessarily jeopardize their positions at Sears and McDonald's, in addition to any other boards that would consider paying for their services, and therefore these directors are not unbiased and can not evaluate any demand by plaintiff in a fair an impartial manner; and

(d)     According to the Company's FY:02 Proxy statement defendant Farrell is Chairman of the Board and Chief Executive Officer of Illinois Tool Works Inc. (manufacturing and marketing of engineered components) since 1996, and also serves as a director of Illinois Tool Works Inc. In addition, defendant Cantalupo is also a director at Illinois Tool Works. Defendants Farrell and Cantalupo therefore have extra-Company entanglements and economic interests which prevent them from taking any action against the other which would jeopardize their standing on the Board of Illinois Tools or Sears, or any other company on whose board they serve or seek to serve. To take the action requested by plaintiff herein would necessarily jeopardize their positions at Sears and Illinois Tool Works, in addition to any other boards that would consider paying for their services, and therefore these directors are not unbiased and can not evaluate any demand by plaintiff in a fair an impartial manner.

70.     Plaintiff believes that after reasonable opportunity for discovery many additional conflicts of interest may be uncovered which further evidence defendants' inability to evaluate any demand made by plaintiff to take the action requested herein in a fair an unbiased manner.

71.     Moreover, the entire Sears Board of Directors and senior management participated in the wrongs complained of herein and/or is controlled by those who have. Sears' directors and senior management are not disinterested or independent. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced defendants breached the fiduciary duties that they owed to Sears in that they

28

failed to ensure that the Company did not engage in improper practices which had the effect of misleading investors as to the true financial and operational position of Sears.

72.     In addition to the foregoing, as stated herein *supra*, as of the filing of this Complaint, several class action law suits have been filed against the Company alleging violations of the federal security laws relating to essentially the same activity complained of herein. Thus, the actions of the Sears Board have severely harmed Sears and subjected Sears to tens and possibly hundreds of millions of dollars in liability for possible violations of applicable securities laws and millions in additional personal liability to Sears and its shareholders.

73.     Moreover, to fully remedy the wrongs against Sears, the Company needs to file an action for immediate injunctive relief against the individuals comprising the Board for breaching the fiduciary duties they owe to Sears and its shareholders. Even though the Board is charged with having ultimate responsibility for the management and control of the Company, the members of the Sears Board have violated the trust, care and fidelity placed upon them by applicable law. The members of Sears's Board of Directors have demonstrated their unwillingness to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for failure to do so. These people are of course the same people who have developed professional relationships with, who are their friends and with whom they have entangling alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

74.     Sears's senior insiders have shown their interests are antagonistic to this lawsuit. The directors have also refused to take immediate action, as authorizing a suit against themselves would require the directors to expose themselves to a huge multi-million dollar liability to the Company, which, due to the particular language of currently utilized directors' and officers' liability insurance policies (*i.e.*, the insured vs. insured exclusion), would not be an insured claim, while the claims asserted via this derivative action are insured.

75.     Defendants are not acting in good faith or in the best interests of Sears and have breached and are continuing to breach their fiduciary duties to Sears.

76.     The underlying misconduct of defendants is not a product of a valid exercise of business judgment, and can not be properly ratified by the Board.

77.     Plaintiff has not made any demand on shareholders of Sears to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Sears is a publicly held company with approximately 315 million share outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

### FIRST CLAIM FOR RELIEF

### Against All Defendants for Breach of Fiduciary Duty

78.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

79.     The Individual Defendants owed and owe Sears fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Sears the highest obligation of good faith, fair dealing, loyalty and due care.

80.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

81.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

82.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Sears has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

83.     Plaintiff on behalf of Sears has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### Against All Defendants for Abuse of Control

84.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sears, for which they are legally responsible.

86.     As a direct and proximate result of the Individual Defendants' abuse of control, Sears has sustained significant damages.

87.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

88.     Plaintiff on behalf of Sears has no adequate remedy at law.

## THIRD CLAIM FOR RELIEF

### Against All Defendants for Gross Mismanagement

89.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

90.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Sears in a manner consistent with the operations of a publicly held corporation.

91.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Sears has sustained significant damages in excess of hundreds of millions of dollars.

92.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

93.     Plaintiff on behalf of Sears has no adequate remedy at law.

### FOURTH CLAIM FOR RELIEF

### Against All Defendants for Waste of Corporate Assets

94.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

95.     As a result of their improper actions and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Sears to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

96.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

97.     Plaintiff on behalf of Sears has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, and waste of corporate assets;

B.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts ' fees, costs and expenses; and

C.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


DATED: November 5, 2002

Marilyn Clark, derivatively on behalf of Sears
Roebuck and Co.

LAW OFFICE OF PATRICK J. SHERLOCK
Patrick J. Sherlock
11 South LaSalle Street, Suite 1600
Chicago, Illinois 60603
Telephone: 312/683-5575
312/896-5784 (fax)

ROBBINS UMEDA & FINK, LLP
Brian J. Robbins
Marc M. Umeda
1010 Second Avenue, Suite 2360
San Diego, CA 92101
Tel: 619/525-3990
Fax: 619/525-3991

Attorneys for Plaintiff

G:\Sears II\Sears Fed Der Complaint.wpd

## VERIFICATION

I, Marilyn Clark, have read the Verified Derivative Complaint for Breach of Fiduciary Duty, Abuse of Control, Gross Mismanagement and Waste of Corporate Assets and know the contents thereof. Based upon my discussions with and reliance upon my counsel, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __4__ day of November, 2002.

MARILYN CLARK



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS



02C 7984

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**Plaintiff(s):** Marilyn Clark, derivatively on behalf of Sears Roebuck and Co.

County of Residence: San Bernadino, CA

Plaintiff's Atty: Patrick J. Sherlock
11 South LaSalle Street
Suite 1600, Chicago, IL 60603
(312) 683-5575

**Defendant(s):** Alan J. Lacy, et al

County of Residence:

Defendant's Atty:

MAGISTRATE JUDGE

**DOCKETED**

NOV 0 6 2002

II. Basis of Jurisdiction:    **4. Diversity (complete item III)**

III. Citizenship of Principal
Parties (Diversity Cases Only)
Plaintiff:-**2 Citizen of Another State**
Defendant:-**4 IL corp or Principal place of Bus. in IL**

IV. Origin :    **1. Original Proceeding**

V. Nature of Suit: .    **160 Stockholder Suits**

VI. Cause of Action:    **A Claim for breach of fiduciary duty. 28 U.S.C 1332**

VII. Requested in Complaint
Class Action: **No**
Dollar Demand:
Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature: _____

Date: _____ 11/5/02 _____

*If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the Back button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action.* **Note: You may need to adjust the font size in your browser display to make the form print properly.**    Revised: 06/28/00

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### Eastern Division

**DOCKETED**
NOV 0 6 2002

In the Matter of

Marilyn Clark, derivatively on behalf of Sears Roebuck and
Co,

             v.

Case Number:

Alan J. Lacy, et al.

## APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Marilyn Clark

*JUDGE NORDBERG*

---

| (A) | (B) |
|---|---|
| SIGNATURE *Brian J. Robbins* | SIGNATURE *Marc M. Umeda* |
| NAME Brian J. Robbins | NAME Marc M. Umeda |
| FIRM Robbins Umeda & Fink, LLP. | FIRM Robbins Umeda & Fink, LLP. |
| STREET ADDRESS 1010 Second Avenue, Suite 2360 | STREET ADDRESS 1010 Second Avenue, Suite 2360 |
| CITY/STATE/ZIP San Diego, CA 92101 | CITY/STATE/ZIP San Diego, CA 92101 |
| TELEPHONE NUMBER (619) 525-3990 | TELEPHONE NUMBER (619) 525-3990 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 190264 (California) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 197847 (California) |
| MEMBER OF TRIAL BAR? YES ☐ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ✓ NO ☐ | TRIAL ATTORNEY? YES ✓ NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ✓ |

| (C) | (D) |
|---|---|
| SIGNATURE *Patrick J. Sherlock* | SIGNATURE |
| NAME Patrick J. Sherlock | NAME |
| FIRM Law Office of Patrick J. Sherlock | FIRM |
| STREET ADDRESS 11 South LaSalle Street, Suite 1600 | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, IL 60603 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (312) 683-5575 | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6205368 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ✓ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ✓ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ✓ NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |

